PLEASURE ISLAND, INC., Plaintiff,

v.

PEPSI-COLA METROPOLITAN BOT-
TLING COMPANY, Inc., Defendant.

Civ. A. No. 62-151.

United States District Court
D. Massachusetts.

April 24, 1964.

Jerome Facher, Hale & Dorr, Boston, Mass., for plaintiff.

Sydney Berkman, Boston, Mass., for defendant.

CAFFREY, District Judge.

This is a civil action in which plaintiff seeks to recover under a written lease for rent and other elements of damages it claims are due it as a result of defendant's breach of the lease. The case was tried to the Court, the parties have filed requests for findings and rulings, and have extensively briefed the issues raised by the amended and supplemental complaints and by defendant's answer which contains eleven separate defenses plus a variety of counterclaims. I find as follows:

1. The plaintiff, Pleasure Island, Inc., is a corporation organized in 1958 under the laws of Massachusetts, operating an amusement park off Route 128 in Wakefield known as Pleasure Island. The amusement park known as Pleasure Island has operated continuously since its first season in 1959.

2. The defendant, Pepsi-Cola Metropolitan Bottling Co., Inc., is a New Jersey corporation having a principal office in New York and operating bottling plants in various states including one in Allston, Massachusetts. At the time of the events in this case its president was one Philip Rubinstein, who is still an

executive of the Pepsi Cola Company, the defendant's parent company. James McCaffrey is vice-president of defendant and is in charge of defendant's local bottling operation.

3. The concept of Pleasure Island originated in 1957 or 1958 as an idea of William Hawkes, then Editor of Child Life Magazine. Hawkes was president of Pleasure Island but is no longer associated with Pleasure Island in any way. Hawkes was put in contact with one C. V. Wood of California who previously had been Director of Stanford Research Institute and also had been general manager of Disneyland. In 1958 and 1959 Wood was president of a small engineering concern known as Marco Engineering Company.

4. When Hawkes returned East he devoted his efforts to the proposed planning, designing, financing, construction and operation of the amusement park that was to be known as Pleasure Island. Eventually, financing and various other matters were arranged and the park began to take shape.

5. Pleasure Island undertook to obtain lessees who would take space, construct exhibits and advertise or sell their products. On or about March 26, 1959, a written contract between Pleasure Island and Marco Engineering was entered into, making Marco the exclusive leasing agent for the park. As opening day drew nearer Hawkes also attempted to get leases. All leases had to be approved by the Pleasure Island Board of Directors.

6. In the winter of 1958 several substantial New England concerns had agreed to take leases at the park and to provide or construct exhibits. Among these were Jenney Manufacturing, H. P. Hood & Sons, Daggett Chocolate, New England Merchants Bank, Swift's Meats, Pepperidge Farm, and Snow's Clam Chowder. Included in exhibits furnished by lessees were antique automobiles, an authentic old-time railroad station, old-time butcher shop, old-time general store, and others. The theme of Pleasure Island was in part New England and in part the Wild West of yesteryear, and the exhibits and construction were consistent with this theme.

7. The premises which are the subject of this action are known as the "Diamond Lil Saloon" or the "Western Saloon," and are located in the so-called Western area.

8. The Western Saloon was approximately 2,700 square feet in area, and was decorated as an old-fashioned western saloon of the gaslight era with a mahogany bar for soft drinks and a stage for shows or performances. The interior fixtures and decorations were constructed at a cost of approximately $50,000, of which Pepsi Cola paid one-half and Pleasure Island one-half. Pepsi Cola had rented somewhat similar premises at Disneyland, known as the Golden Horseshoe, and had put on a show there. By 1958 Pepsi Cola had been at Disneyland for four or five years and Pepsi Cola officials were acquainted with C. J. Wood from his associations with Disneyland.

9. In December 1958, both Pepsi Cola and Coca Cola had been solicited regarding renting the premises at Pleasure Island known as the Western Saloon and were interested. Hawkes and Wood had talked to two Coca Cola executives, Frank Adams, head of local Coca Cola bottling operations, and Frank O'Brien, regional sales manager for New England for Coca Cola. Both Adams and O'Brien were aware that Pleasure Island wanted $25,000 for a five-year lease of the Western Saloon and that the first and last years rent were to be paid in advance.

10. The Pleasure Island Board of Directors had placed a valuation of approximately $10 per square foot as the rental value of Pleasure Island generally and believed that $25,000 was a fair rental figure for the Western Saloon.

11. At some time in December 1958, Wood spoke with one Richard Petrie, now of Dallas, Texas, who was then Executive Vice-President of Pepsi Cola. At a meeting and in a telephone conversation Wood told Petrie of the plans for Pleasure Island, including the hoped-for attendance and the hoped-for success,

financial and artistic, in the coming season. At this point the park was not in existence but only barely past the drawing board stage.

12. In these conversations, Wood sought to interest Pepsi Cola in a five-year lease at $15,000 annually for the Western Saloon and to obtain a commitment from Pepsi Cola to contribute $25,000 to the cost of constructing and furnishing the Western Saloon. Neither Wood nor Petrie had authority to bind their respective principals because the actions of each were subject to approval by his Board of Directors. Their negotiations for a lease at $15,000 per annum did not ripen into a binding contract.

13. Following his conversations with Wood, Petrie talked with Pepsi Cola executives and thereafter told Wood that Pepsi Cola would be agreeable to a five-year lease at $15,000 and to spending $25,000 to reimburse Pleasure Island for part of the cost of the Western Saloon. Wood reported this fact to the Board of Directors of Pleasure Island, but the Board did not approve a lease to Pepsi Cola at $15,000 and reminded Wood of the $25,000 price put on the premises. Hawkes also expressed concern because at about the same time the premises had also been offered to Coca Cola for $25,000 subject to approval by Coca Cola's Board of Directors. Hawkes had been advised by local representatives of Coca Cola that the necessary approval probably would be forthcoming in five to seven days. The local representatives of Coca Cola were interested and enthusiastic about the prospects of Pleasure Island and in fact had first contacted Hawkes shortly after October 1958 and before Pepsi Cola had begun its negotiations.

14. After his meeting with the Pleasure Island Board of Directors, Wood telephoned Petrie who was then in his office in New York. There is a conflict of testimony as to the exact nature of this telephone conversation between Wood and Petrie. Petrie testified as to his memory thereof, and Linnell and Hawkes testified as to what Wood told them about this conversation. Wood did not testify. On the basis of this conflicting testimony I find that C. V. Wood asked Petrie whether Pepsi Cola would agree to execute a five-year lease in which the yearly rental figure was raised from the $15,000 discussed in their earlier talks to $25,000. He told Petrie that it embarrassed him to make this request but said it was necessary to do so because the Pleasure Island Board of Directors would not approve a lease at $15,000 per annum and because other representatives of Pleasure Island were then actively negotiating with Coca Cola for a $25,000 per annum five-year lease.

Petrie claimed that Wood said to him in the course of this conversation that Coca Cola had made an offer of $25,000 to Pleasure Island. To the extent that Petrie's testimony indicates that Wood represented to him that Coca Cola had made a firm offer of $25,000, which would become legally binding on Coca Cola if the Pleasure Island Board of Directors elected to accept same, I do not believe Petrie. I have in mind that much of the evidence indicated that offers by and large emanated from Pleasure Island and ran *to* potential lessees rather than *from* potential lessees. Petrie himself testified that in part of the conversation in question Wood said to him that he (Wood) "thought if we (Pepsi) persisted in holding him to the $15,000 it would be embarrassing to us, he doubted very much if we would have the complete cooperation of the Pleasure Island Board of Directors and the other participants." There is not a scintilla of evidence in the record that the Board of Directors were more interested in or enamored of Pepsi Cola than Coca Cola. The quoted conversation indicates that Wood and Petrie at the time of the conversation both felt that Pepsi Cola and the park were free to execute an exclusive vending agreement for Pepsi Cola at the $15,000 figure. It is absurd to believe that the executives of this park, seeking to obtain the highest return from the leases they were executing, would discuss the consequence of executing a $15,000 lease to Pepsi Cola, which both sides agreed had not become

a binding contract at this time or thereafter, if in fact a hard and fast offer better by $50,000 (five years at $10,000 more a year) was available to the park Board of Directors to accept or reject.

I find that if the word "offer" entered into the Wood-Petrie conversation at all, as to which I have grave doubts, it was used in such a context that an experienced businessman like Petrie would, and Petrie in fact did, understand it as expressing no more than the fact that employees of Coca Cola were then engaged actively in negotiating with Pleasure Island for a possible exclusive soft-drink vending contract, coupled with a lease of the Western Saloon, for the figure of $25,000 per year. I am not persuaded that the representations of fact by Wood went beyond this, nor am I persuaded that any executive of Pepsi Cola relied on any untrue representations prior to executing the lease in issue herein.

15. Coca Cola executives Frank Adams and Frank O'Brien were both enthusiastic about the possibility of Coca Cola's becoming the exclusive soft-drink vendor at Pleasure Island, and their interest in so doing caused Ralph H. Garrard, national sales manager of Coca Cola, to make a trip from Atlanta, Georgia to Boston to inspect Pleasure Island and discuss the proposed lease.

16. Representations were made by Adams and O'Brien, the local representatives of Coca Cola, to Hawkes, to the general effect that within a matter of days they expected approval of a $25,000 per year "deal" to be forthcoming from the Board of Directors of Coca Cola.

17. The record is not clear as to just when Mr. Garrard came to Boston from Georgia. However, he met both Wood and Hawkes in Boston some time during the month of December 1958. It is not clear when this meeting took place with respect to the Pleasure Island Board of Directors' discussion of the $15,000 Pepsi Cola proposal, or with respect to the time when the interest and enthusiasm of Coca Cola was expressed by Adams and O'Brien together with the statement that acceptance would be forthcoming from Atlanta in five to seven days.

18. No agreement was made between Pleasure Island and Coca Cola at this meeting with Garrard, nor did Garrard make an offer which had the authority and approval of the Coca Cola Board of Directors.

19. Petrie was a man of considerable business experience and had a wide responsibility in overseeing the operations of the various bottling plants under his jurisdiction. He was and for some years prior had been a salesman, was able to recognize sales talk, and was capable of and did reach his own conclusions and judgments with respect to Pepsi Cola matters. It was his practice to consider all factors with respect to Pepsi Cola's interest, independently of what Coca Cola intended or would have done under similar circumstances.

20. In deciding to recommend both the $15,000 and the $25,000 proposals to Pepsi Cola's top executives, Petrie reached his own conclusion independent of any statements made by Wood. The statement about Coca Cola's "offer" played no material or influential part in this decision. Petrie was influenced by the opportunity to have Pepsi Cola sold in an Eastern amusement park which he hoped would have the appeal of Disneyland. He was influenced and impressed by the opportunity to associate with New England business firms such as Jenney Gas, H. P. Hood, Swift's Meat, Cabot, Cabot & Forbes, Pepperidge Farm, and others, and believed such association to be advantageous to Pepsi Cola. He was further influenced by the low per capita consumption of soft drinks in New England, and saw Pleasure Island as a vehicle to increase this consumption. He was aware of and influenced by Pepsi Cola's experience with Disneyland, where Pepsi Cola had a lease substantially similar to the one proposed and had put on a show there. Petrie anticipated and hoped for the same relationship between Pepsi Cola and Pleasure Island as Pepsi Cola had with Disneyland, and hoped for a similar experience with similar results.

21. Although Petrie made a memorandum of his initial conversation with Wood with respect to the $15,000 proposal, he did not deem the second telephone conversation about Coca Cola of sufficient importance or materiality to write any memorandum or report. Neither did he report it to legal counsel Peter Borie, according to Mr. Borie's testimony. Even if he did so report it, as Petrie testified, Mr. Borie did not consider it of sufficient importance or materiality to do anything about it and thereafter approved and recommended the lease, which contained among other things the important provision that Pepsi Cola *had not* relied on any statements by Pleasure Island. Borie was familiar with this type of a provision and was aware of its significance with respect to the issue of reliance. While such a clause does not insulate a party to a lease from a showing by the other party thereto of fraud in cases wherein a fraud has been perpetrated, Bates v. Southgate, 308 Mass. 170, 31 N.E.2d 551, 133 A.L.R. 1349 (1941), the presence of such an exculpatory clause in a lease negotiated over a four-month period does have evidential value and tends to support the finding "that no extraneous representations were in fact made, or if made that they were not relied upon." Id., 308 Mass. at 183, 31 N.E.2d at 559, 133 A.L.R. 1349.

22. No written record or memorandum appears anywhere in the files of Pepsi Cola indicating that Wood made any statements about Coca Cola, or indicating that anything Wood said about Coca Cola was untrue, was material, or had been relied on. .

23. As a further indication of the non-existence of, or, at the least, the non-reliance on any statements by Wood, McCaffrey, defendant's vice-president on the scene in Boston, as late as May 4, 1960 was not opposed to returning to the park and, according to Petrie, was in favor of it, and he so testified. In April 1960, Borie, the attorney acting for the defendant, was in favor of returning to the park. Never at any time prior to May 16, 1960 had there been a claim of fraud or of breach of the lease on the part of Pleasure Island. The inference is clear that whatever statements were made by Wood and Petrie in 1958 with respect to Coca Cola they were of such small importance and relevance to Pepsi Cola that it paid little attention to them, did not rely on them, and did not make them a basis for any business decisions.

24. No misrepresentations of fact were made by Pleasure Island to Pepsi Cola and any statements made by Wood with respect to estimates of attendance and the future of the park were mere prophecies or predictions which did not constitute material representations of existing facts. Any statements made by Wood to Petrie with respect to Coca Cola represented his understanding of the then state of negotiation between Coca Cola and Pleasure Island and were so received by Petrie. Such statements were not made intentionally to deceive and were not false statements of fact. Evn if it were assumed in Pepsi Cola's favor that such statments as to Coca Cola were untrue, they were not relied on by Pepsi Cola and were not in any degree an important or material inducement or persuasion to enter into the lease. Pepsi Cola exercised its own business judgment based on the factors previously outlined and on its own hopes and predictions for the future of Pleasure Island.

25. Approximately four months elapsed between the time of the Wood-Petrie conversation and the execution of the lease in issue. During that period the lease was carefully reviewed by Attorney Borie, who was familiar with this type of lease, and who made certain changes. In addition, Petrie reviewed the draft lease with Hawkes, president of Pleasure Island. At no time during these four months was any mention made of Coca Cola or of any alleged representations made by Wood or anyone else.

26. The lease was executed on or about April 6, 1959 by Philip Rubinstein on the recommendation of Mr. Borie. Thereafter, the sum of $50,000 was paid by Pepsi Cola to Pleasure Island for the

first and last years' rent as the terms of the lease provided. Pepsi Cola was sold exclusively in the park in 1959 and an expensive and good quality show was put on by Pleasure Island in the Western Saloon. The show was a popular attraction and approximately 275,000 drinks were dispensed in the Western Saloon. At the end of 1959 Pepsi Cola looked forward to participating in the 1960 season.

27. At the end of the 1959 season Pepsi Cola was aware of what the season's total attendance at the park was, and the various problems with weather, construction and other matters which affected attendance, as well as the park's financial difficulties following 1959 operations.

28. Between September 30, 1959 and May 15, 1960 Pepsi Cola was aware that the park was trying to organize its financial affairs, deal with its creditors, obtain new financing, and prepare for the 1960 season. Various attempts were made to effect a refinancing and rearrangement of the park's affairs by various people including one Harold Korda and the Merchants National Bank of Boston. Various proposals were made, meetings were held with creditors, and letters and documents were written, all in an attempt to settle the park's indebtedness and continue its operation.

29. In early 1960, Harold Korda offered Pleasure Island's unsecured trade creditors approximately 20 per cent, and 75 to 80 per cent of the creditors accepted. Thereafter the Merchants National Bank used its efforts to reorganize Pleasure Island's fiscal affairs. Finally, in May 1960, new capital to the extent of $134,000 was brought into the corporation, contributed by Messrs. Smith, Lee and Linnell, problems with creditors were largely resolved, and Pleasure Island prepared to and did reopen for the 1960 season.

30. During the entire period of financial difficulties through which Pleasure Island passed, between the 1959 closing and the opening of the 1960 season, Pepsi Cola never made any contention that Pleasure Island had violated any part of its lease, had committed any fraud, or had made any mispresentation. In fact, as late as April 18, 1960, Borie advised the Merchants National Bank that Pepsi Cola would be willing to accept 20 cents on the dollar on its claim for syrup delivered to Pleasure Island during the 1959 season and return to the park if management satisfactory to Pepsi Cola took over. Pepsi Cola had no legal right, and Borie was well aware of this fact, to make this a condition of honoring its lease.

31. In February 1960, McCaffrey warned other Pepsi Cola executives that March 1, 1960 was the deadline for Pepsi Cola to exercise its option to require Pleasure Island to put on a show. Pepsi Cola never exercised this option despite McCaffrey's reminder and Pepsi Cola was aware that in failing to do so it became obligated by the terms of the lease to put on a show at its own expense. The cost of the show to Pleasure Island in 1959 had been approximately $50,000. On May 4, 1960, McCaffrey forwarded newspaper clippings to Pepsi Cola executive offices in New York indicating the park would reopen. At that time he made no claim or reference to fraud and did not oppose Pepsi Cola's returning to Pleasure Island for the 1960 season. By reason of its failure to give notice to Pleasure Island on or before March 1, 1960 and thus put the obligation on Pleasure Island to conduct a show at the Western Saloon, Pepsi Cola was faced with the necessity of putting on a show at its own expense for the 1960 season if it honored the lease for that year. It is reasonable to infer that the Pepsi Cola executives knew that putting on a show throughout the entire 1960 season would involve a substantial additional expenditure to Pepsi Cola over and above the $25,000 rent.

32. On May 16, 1960 Pepsi Cola wrote a letter to Pleasure Island at 50 Federal Street, Boston, purporting to terminate the lease. The letter gave "failure of consideration" as the principal reason for termination and in addition alleged false representations. Further, the letter

indicated, in a sentence inserted by Borie, that Pleasure Island was about to commit future violations of the lease. The basis for this charge was Borie's having read newspaper clippings concerning the reopening of the park, which clippings in no way warranted any such conclusion. The highly improper and illegal attempt by executives of Pepsi Cola to premise in part the termination of a substantial lease on the basis of an unsubstantiated, uninvestigated newspaper report, read and forwarded to them by their house counsel (who should have known better than to allow corporate action on such a basis) is a classic example of the type conduct referred to in paragraph 35 infra.

33. The letter of May 16, 1960 did not specify what was meant by "failure of consideration," nor did it specify the alleged misrepresentations or the alleged future violations. Pleasure Island representatives met with Pepsi Cola officers on May 23, 1960, but Pepsi Cola refused to give any specifics and told Pleasure Island that the letter spoke for itself.

34. Although the letter of May 16 claimed that the lease was entered into by fraud and made claim for the return of substantial amounts of money, no suit was ever brought by Pepsi Cola against Pleasure Island, and the first time any specific allegations of misrepresentation were made was in a counterclaim filed by Pepsi Cola in 1962.

35. The actual decision to terminate the lease was made by a Mr. O'Connell, an official of Pepsi Cola now deceased. Mr. O'Connell had been dissatisfied with the Pleasure Island situation for many months and he did not wish Pepsi Cola to return to the park in 1960 if he could avoid it. Borie admitted that O'Connell was an executive who often made decisions based on business considerations first and then called on the legal department to justify such decisions after they were made.

36. After the lease had been purportedly terminated by Pepsi Cola in its letter of May 16, 1960, McCaffrey went to Pleasure Island in July 1960, took pictures of the Western Saloon, and made other observations. He forwarded his report and the pictures to Borie in the legal department. It is an appropriate inference that McCaffrey went to Pleasure Island for the purpose of attempting to find some basis to shore up the termination of the lease. He did not customarily take pictures of former customers' premises nor did he customarily send such pictures to New York counsel.

37. Viewing all of the evidence as a whole, and in light of the specific facts set forth above, I find that at the time of the May 16, 1960 letter Pepsi Cola did not have any factual information or any bona fide basis for charging Pleasure Island with making false statements or with any breach of the lease. Pepsi Cola's decision to terminate the lease was made by O'Connell for business reasons, following the exercise of his own judgment as to the best course for Pepsi Cola to follow under all the circumstances. Having made the decision to terminate the lease, Pepsi Cola then set about attempting to trump up reasons to justify the termination.

38. On May 24, 1960, Pleasure Island by its attorney notified Pepsi Cola that it had wrongfully repudiated the lease, that Pleasure Island denied any misrepresentations or any breach of the lease, and that it intended to hold Pepsi Cola fully liable. Thereafter Pleasure Island retained its intention to enforce its rights and ultimately brought suit in 1962.

39. Pepsi Cola failed to pay any rent to Pleasure Island in 1960, 1961 and 1962. The Western Saloon premises were available to Pleasure Island but Pepsi Cola did not attempt to utilize them or exercise any rights with respect to them. On the contrary, Pepsi Cola took the position that it had no obligation under the lease and refused to do anything whatever with respect to the lease. They were aware that failure to pay rent was a breach of the lease and no notice to that effect subsequent to the notice given May 24, 1960 by the plaintiff would have served any purpose.

40. Without legal justification Pepsi Cola persisted in its refusal to honor its obligations under the lease. Plaintiff's sending a notice of default for failure to pay rent would have been a vain and useless act. Insofar as any notice of default would otherwise have been required under the lease, I find on all the evidence that such notice was waived by the conduct of the defendant under all the circumstances and facts before me, and that the defendant by its conduct is estopped to rely on the lease in order to evade the consequences of its own breach.

41. I find that Pepsi Cola owes Pleasure Island $25,000 per year for the years 1960, 1961 and 1962, or a total of $75,000, with interest, for unpaid rent. To the extent, if any, that Pepsi Cola is entitled to a credit for whatever net income Pleasure Island may have derived from its use of the premises during those years, there is no evidence to establish the amount of any such credit. I accordingly make no finding crediting Pepsi Cola with any amount against the $75,000 rental liability. Although not obligated to do so by applicable Massachusetts law, Pleasure Island did make reasonable efforts to relet the Western Saloon during the years 1960, 1961 and 1962, although its efforts were unsuccessful.

42. I find that neither Pleasure Island's attempt to relet the Western Saloon, or its use thereof during that period, constituted either a surrender of the premises or a waiver of its rights under the lease. On the contrary, had it allowed this property to stand idle in the midst of the park, its having done so would have cast a pall over the atmosphere of the entire park which in turn would have diminished the income from other activities and concessions. This would have exposed the park to a charge of failing to mitigate damages.

43. Between 1960 and 1963 Pepsi Cola did not pay to Pleasure Island amounts due for insurance premiums and real estate taxes attributable to the Western Saloon as required under the lease. I find that Pepsi Cola owes Pleasure Island $5441.00, with interest, for fire insurance premiums, and $1235.00, with interest, for real estate taxes paid by Pleasure Island, which amounts were properly chargeable to Pepsi Cola under the terms of the lease.

44. Because of defendant's breach of the lease plaintiff was obliged to bring suit to recover for rent and other damages attributable thereto and to defend a counterclaim filed with reference thereto. As a consequence plaintiff has incurred substantial legal fees and expenses in connection with this litigation, and I find that a reasonable attorney's fee to compensate plaintiff therefor is $10,000.

45. I am not persuaded that plaintiff has sustained its burden of proof as to any other items of damage claimed in its complaint, and as to any remaining elements of alleged damages the complaint is hereby dismissed for failure to prove.

46. With regard to defendant's counterclaim, I find that Pepsi Cola is entitled to recover the sum of $4083.45, with interest from May 16, 1960, for Pepsi Cola syrup delivered to Pleasure Island and not paid for. I also find that defendant is entitled to recover $5000.00, with interest, the sum it was induced by the management of Pleasure Island to expend in connection with a contract for a proposed recording of songs which would publicize the park and Pepsi Cola, which recording was never released. With the exception of these two items I find no merit in the various contentions advanced in defendant's counterclaim, which is otherwise hereby dismissed.

47. Judgment accordingly.